# UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

IN RE:

RUST OF KENTUCKY, INC.                                    CASE NO.: 10-10271(1)(7)

_____Debtor_____

RUST OF KENTUCKY, INC.                                    AP NO.: 10-1032

                                Debtor-in-
                                Possession/Plaintiff

vs.

TMS CONTRACTING, LLC, et al.

_____Defendants_____

---

## MEMORANDUM-OPINION

---

       This matter came before the Court for trial on the Complaint of Debtor/Plaintiff Rust of Kentucky, Inc. ("Rust"), against Defendants TMS Contracting, LLC ("TMS") and Fidelity and Deposit Company of Maryland ("F&D").  The Court considered the trial testimony of the witnesses, the documentary evidence submitted, the arguments of counsel and its own research.  For the reasons stated herein, the Court will enter the attached Judgment in favor

of Rust and against TMS and F&D.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## **FINDINGS OF FACT**

Plaintiff Rust filed suit against Defendants TMS and F&D claiming damages for breach of contract and wrongful termination (against TMS) and for action on a payment bond (against F&D).  The dispute between these parties arose from a construction job undertaken by TMS, a Clarksville, TN-based general contractor, on behalf of the City of Clarksville ("City") beginning in 2009.  The City desired redevelopment of its then-exiting Clarksville Fairgrounds Park ("Park") into an area including a fishing pond, 28 acre marina, new boat ramp, public wetlands, park structures, event pavilions including an amphitheater, ball fields and commercial properties.  Rust, a Cromwell, Kentucky-based earthmoving contractor, was awarded the subcontract to perform mass excavation and slope construction for the marina and fishing pond.  This project was extensive involving, among other things, the excavation of approximately 1,000,000 cubic yards (cy) of soil for the fishing pond and marina over 150 days beginning mid-summer 2009 to be concluded at the latest by mid-November 2009.

**HISTORY**

In 2005 the Clarksville River District, a division of the City, hired JJR, LLC ("JJR"), to prepare a feasibility study for the reconstruction of the Park, located at mile 126.7 of the Cumberland River ("River"), Right Bank, Lake Barkley, TN.  JJR specializes in landscape architecture, planning, urban design, civil engineering, and has substantial expertise in marina design and reconstruction.

JJR developed a schematic plan, which in turn evolved into a feasibility study and then ultimately final design drawings for the Park.  JJR's feasibility study provided, among other things, a cost/benefit analysis of the redevelopment for the City.  The cost of redevelopment would be impacted by certain key Park features and potential construction methods.

Excavation of the marina basin could have been undertaken "in the wet" or "in the dry."  JJR's final design drawings, tendered with the bid package, specified excavation "in the dry."  An excavation "in the dry" would be undertaken with the inlet plug intact, holding back the River, while the excavation would be accomplished using land-based equipment over haul roads.  An excavation "in the wet" would have involved opening the inlet to the River, allowing the River to flow in during construction with excavation from a barge.  An excavation "in the dry" would be the cheapest method, unless the final design drawings required installation of a vertical groundwater cut-off mechanism; sheet piles driven into the ground to a sufficient depth to create an impermeable barrier from the River.  An

-3-

excavation "in the wet" would have been very expensive, requiring rock blasting and excavation and then the slow process of dredging and drying the excavated sludge before lifting and placement according to fill specifications.  Dredging might also involve the expense of storing sludge off site given the limited on-site storage acreage.

JJR also chose to design this as a "balanced" project meaning the contractor would use soils excavated from the Park in construction of the marina slopes, for other on-site construction and disposal.  Utilizing soils excavated from the site saved the cost of purchasing suitable soils ("engineered or structural fill") and transporting them to the job site.  Further, on-site soil excavated "in the dry" would conform more readily to engineered fill specifications for slope construction rather than soils excavated "in the wet," which would take longer to dry and might also require expensive soil amendments.   A balanced project excavated "in the dry" without a vertical groundwater cut-off would be the least expensive method for the work envisioned.

A slope stability analysis, including engineered fill specifications, was prepared for the City by Earth Science Engineering, LLC ("ESE") in September 2008 using a single soil sample from the Park ("2008 Slope Stability Analysis").  Substandard structural design, composition/moisture content or placement of soil outside of design specifications can result in slope failure, *i.e.*, sloughing off of the slope into the marina basin.  Slope instability involves obvious safety issues, but also schedule delays and additional costs to repair the damage.

-4-

In 2009, upon preparation of final design drawings and City approval, JJR prepared the bid package for the marina, shoreline protection, boat launch ramp, pedestrian bridge, fishing pond and a stormwater management system ("Bid Package 1") specifying that the site earthwork  was to be completed "in the dry."  Despite boilerplate provisions allowing for dredging and the placement of sheet piles in the Project Manual, the design drawings did not include a vertical groundwater cut-off system and the "in the dry" specification did not permit a bidding contractor "means and methods" discretion to excavate "in the wet." This is because the Department of the Army, Nashville District, Corps of Engineers permit ("Corps Permit"), applied for and acquired by JJR on the City's behalf utilizing JJR's final design drawings required construction "in the dry."  Both the General Description of the Work and the Special Permit Conditions repeat the "in the dry" condition.  The Permit explicitly states that it did not allow deviation from the design drawings.  A change in the plans for the proposed work required revised plans and application to the Corps.  Further the Permit restricted all construction activities to be performed at normal pool elevations of Lake Barkley, between 355 and 360 feet, depending upon the season.  Bid Package 1 did not include a copy of the Corps Permit, which was not issued until July 6, 2009.

As the Park sits in a flood plain (a drainage basin for some 800+ acres of surrounding lands), within 300 feet and adjacent to the River and the design drawings called for excavation depth to 345 feet, well below normal pool for the River, the hydraulic imbalance that would exist until the marina was flooded with the River would imperil

-5-

excavation, slope construction and stability.   This hydraulic imbalance would not have existed had the excavation been "in the wet."

## BID PACKAGE 1-SITE EARTHWORK

Bid Package 1 was divided into four (4) different phases, each Phase involving many design drawings for the bidding contractors to study and follow for ultimate construction. Phase 1 involved, among other things, excavation of the fishing pond and construction of a berm in the north end of the site near the proposed marina basin to protect the construction area from stream 1 overflows.  Phase 2 involved storm sewer construction and excavation of the south side of the marina basin.   Phase 3 involved removal of the temporary berm and construction of the north side of the marina basin.  Phase 4 involved removing other temporary berms to allow a stream to flow into the marina and removal of the inlet plug to flood the marina basin with the River.  The mass excavation amounted to approximately 75 percent of the project.

Overall, the City expected to issue two additional bid packages to complete the Park reconstruction.   As TMS's experience was primarily construction of churches and auto dealerships, it was an interested, potential bidder for the remaining bid packages involving Park buildings and completion of the Park.  The City withheld opening for bid the remaining packages until early 2010 at the suggestion of JJR due to its overall plan in staging project completion.

On May 15, 2009, the City and JJR issued Bid Package 1 which included among other things the construction drawings and Project Manual. Bidders were entitled to review the bid package, visit the Park, dig test pits and visit a web-based "plan room" which included the 2008 ESE Slope Stability Analysis and other geotechnical reports prepared by ESE from March 2006; August 2007; and April 2009.

On May 27, 2009, Rust visited the Park and specific locations identified by the City, and in the presence of TMS and its project consultant, Brasfield & Gorrie, LLC ("B&G"), dug test pits to study the subsurface conditions. Rust also viewed photographs of test pits dug by TMS. Rust was satisfied that the soils did not show high moisture content, high hydraulic conductivity or any condition a reasonable earthwork contractor would conclude required significant dewatering; methods used to keep the site sufficiently dry to undertake the excavation "in the dry," to prepare excavated soils to engineered fill specification and finally for placement according to the design drawings. Mark Rust, the principal of Rust, manipulated a soil sample back at his office in Cromwell. Rust undertook a reasonable site investigation that is typical of experienced earthwork excavators. Earthwork contractors do not typically acquire their own engineering reports, instead relying on those acquired by the owner.

TMS was awarded the prime contract on June 23, 2009. As required by contract, TMS supplied payment bond number PRF08948800, naming TMS as principal, F&D as surety and City as obligee, for the penal sum of $7,987,950 ("Payment Bond"). TMS

-7-

separately contracted with B&G, a national general contractor with extensive experience in earthmoving, to act as TMS's construction manager and provide on-site supervision. B&G was on site throughout Rust's performance period.

On July 8, 2009, TMS and Rust entered into two separate subcontracts; one for the Phase 1 fishing pond for the contract sum of $1,282,518.63 and the other for the Phase 2 marina mass excavation for the contract sum of $2,977,926.17. Both contracts had a start date of July 13, 2009 and a completion date of November 15, 2009. As required by contract, Rust supplied two payment and performance bonds for each contract in the penal sums of $1,282,518.63 (bond number 8955082) and $2,977,926.17 (bond number 8955083) respectively.

The 2008 ESE Slope Stability Analysis relies solely on the data from boring C-1 (September 2008 Report) (an area within the marina basin) which showed clays and sandy clays which are known to have low hydraulic conductivity or a very low ability to transmit water through them. The 2008 ESE Slope Stability Analysis does not explain how the soils at C-1 would be representative of the soils throughout the entire marina. ESE did not modify its 2008 Slope Stability Analysis after it conducted additional borings in April 2009, just prior to Bid Package 1 being offered for bids. JJR did not modify its final design drawings to include a vertical groundwater cutoff system in light of the April 2009 boring data either.

The April 2009 report included eight (8) different boring samples from the peninsula area where certain building foundations were to be placed.  The S-4 boring (closest to the marina), in particular,  revealed poorly graded sands and gravels below the grade of the bottom of the excavation which indicated high permeability and therefore high hydraulic conductivity.  The April 2009 report also indicated "flowing" sand throughout each of the eight borings performed which indicated high permeability.

Roman Hryciw, Ph.D, Associate Chair, CEE Department of the University of Michigan provided the opinion that "(B)ased on soil grain size distributions found . . . and the classification of soils based on these distributions as described in the April 2009 report, the soils beneath the peninsula at boring S-4 could transmit water at flow rates as much as 1 million times greater than the soil tested from C-1. " Further, Dr. Hyrciw noted that the 2008 Slope Stability Analysis failed to specify the potential hydraulic flow through the soils underlying the peninsula and reevaluate the constructability of the marina "in the dry" to a depth at least 8 ft and as much as 33 feet below the elevation of the River.

In light of the S-4 boring data, Dr. Hyrciw opined the engineers should have (a) pursued the possible hydrogeologic connections to the excavation of the marina; (b) conducted additional borings to establish the gravel layer continuity; (c) performed an underseepage analysis; and (d) revised their previous findings in light of the S-4 boring data and suggested that the project plans and specifications for excavation "in the dry" include specifications for a vertical groundwater cut-off system to prevent the River from entering

-9-

the excavation.   TMS's geotechnical expert, Timothy LaGrow, agreed with Dr. Hyrciw that

only a geotechnical engineer with a master's degree and specialized experience could

reasonably understand the potentiality for an artesian condition, essentially the River

flowing in from below the marina bed, based upon the contract documents and the

geotechnical reports in the "plan room."

The Court finds it quite significant that ESE and JJR, both engineering firms, reviewed

this data and did not revise the slope stability analysis or final design drawings in light of

the April 2009 borings, particularly S-4 and notify bidding contractors that a vertical

groundwater cutoff system should have been incorporated into bids and anticipated in

construction.  The extensive nature of the marina excavation and the proximity of the River

is not lost on the Court, nor should it have been on the engineers whose opinions were

relied upon and who designed the project.  It is within the engineer's scope and expertise

to review such geotechnical reports and create a safe and constructable design from the

beginning.   JJR represented the City in this process and the owner of the Park would

normally bear the risk, the cost of the construction and of its agent's flawed engineering

incorporated into the final design drawings.

The Contract between the City and TMS provided that TMS was responsible for

dewatering the site so the construction would be performed "in the dry" and in such a way

as to maintain stability of the slopes and bottom of the excavation.  The Contract has

several Addendums.  Addendum 1 provides among other things that there would be no

-10-

weather related extensions except that if the River reached 378 feet, flood stage, consideration may be given for an extension during those flood days.  The Addendum states that TMS was to expect handling wet materials, for no additional consideration, and was responsible for handling, appropriate drying and compaction of those materials.  The June 1, 2009 Addendum also states that "(s)pecific constraints from the Corps of Engineers remain unknown as of this date."  No additional Addendums were issued relating to the limitations placed on construction by the Corps Permit.

On June 11, 2009, TMS, B&G and Rust met to discuss bid assumptions and means and methods for construction.  This discussion also covered the rock estimate (rock was visible at the surface in the Park) and the use of the trench and sump system to control water.   At this time, TMS was satisfied Rust had sufficient experience to undertake the subcontract work.  TMS accepted Rust's bid and drafted the Rust scope of work.

While the TMS/Rust subcontracts generally incorporate the terms of the prime contract between the City and TMS, the more specific Addendums reflecting the scope of work in the TMS/Rust subcontracts do not articulate any specific responsibility for dewatering the site.  An unsigned memorandum transmitted via e-mail by Rust to TMS on July 29, 2009 and Rust's Earthwork Management Plan state that Rust would assume all dewatering on the site per the drawings tendered, based upon assumption of the quantity of water they expected, with as many as 2 sump pumps for surface water from rain and storm events and groundwater.  The drawings attached to the memorandum indicated a

trench and sump pump system for the marina which based upon its experience with similar previous jobs, Rust believed would be sufficient.  This memorandum also references the procedures in the event of excessive groundwater including construction of a berm to isolate the groundwater to River elevation until the source could be found.   Rust's bid to TMS estimated $210,000 for water management based on the use of a trench and sump system, an amount very close to bids submitted by Griffin Dewatering ($262,225) and Civil Constructors ($281,266).  JJR estimated the cost to dewater at $34,650.  In light of the competing bids from parties at arm's length from the City, Rust's bid was reasonable.

The City's Contract with TMS also included a provision wherein the excavation would be "unclassified" which meant there would be no extra payment for rock excavation. Neither of the TMS/Rust subcontracts specifically delegates rock removal to Rust. Nevertheless, Rust estimated (using industry standard measurements and specialized software) 22,000 cy of rock would be excavated and included the estimated costs in its bid.

## SITE EARTHWORK

Work could not begin on the Park until July 6, 2009 when the Army Corps of Engineers issued the Corps Permit to the City for the Project.  Upon notice of receipt of the Corps Permit, Rust began the site earthwork.  The delay in acquisition of the Corps Permit left Rust short approximately 20 days to complete the work than had been anticipated.  In addition, TMS did not supply a copy of the Corps Permit to Rust despite the Special Permit Condition that all contractors were to be made aware of its conditions and abide by them.

-12-

Given typical seasonal daylight hours, precipitation, working conditions and daily excavation estimates, Rust believed it had built in more than sufficient time to finish the excavation by mid-November when earthwork contractors generally shut down sites in Tennessee.  At the Park, the rain began to fall early in the morning on July 22, 2009 and thus began a period of months wherein precipitation for the region exceeded the norm and all reasonable expectations.  In addition to the deluge were extended periods of overcast skies, all of which taken together slowed excavation, dewatering of the site, drying of the excavated soils and placement of the engineered fill for the slope construction.  JJR, TMS, B&G and Rust all recognized and acknowledged the negative impact the weather had on the project, yet tension began to build between the participants over site conditions and weather delays.

Early on, B&G disagreed with Rust on virtually every issue at the site; "means and methods" of excavation, dewatering efforts, management of the site, staffing levels, hours of operation, equipment utilization,  use of a hoe ram to chisel at rock pinnacles instead of blasting rock from the beginning.  B&G wanted Rust to blast the rock as soon as possible and felt the hoe ram was inefficient, wasted precious project time and put the project behind schedule.   Rust disagreed and believed exposing rock and blasting without sufficient overburden would create an unsafe blasting condition and violate the safety plan for the project.  Instead of 22,000 cy of rock, Rust ended up excavating at least 88,000 cy, far in excess of the amount anyone had anticipated or which was included in its bid.

Excavation work continued nevertheless. By February 2010, Rust had completed 99 percent of Phase 1 and over 80 percent of Phase 2 of the project.

On August 13, 2009, when Rust began to install its planned sump on the west slope of the marina, the hole collapsed due to the existence of heavy organic matter (not indicated in the geotechnical engineering reports) that was unsuitable for fill and also threatened slope stability. TMS and B&G immediately recognized that the collapse was caused by a differing site condition and sent an email to JJR.

Also on August 13, 2009, as the rainfall continued and the project schedule was negatively impacted by surface water, TMS and B&G demanded that Rust install and utilize a wellpoint system to control water at the project, abandoning the trench and sump plan as unsatisfactory given the continued above-normal precipitation. Thompson Pump proposed a wellpoint system for an estimated $60,000 over the anticipated duration of the project. Rust had no experience with the wellpoint dewatering system and so Thompson provided a plan for placement of the wellpoint system. Later B&G directed Rust on placement and maintenance of the wellpoint systems.

Continued excavation depended upon sufficiently dry conditions as well as an efficient dewatering system that did not actually prohibit movement of excavation machinery across the site. At times, wellpoint systems had to be dismantled so equipment could traverse the site. Wellpoint systems placed improperly or in extreme conditions such as a high hydraulic imbalance can have the undesirable consequence of drawing more

-14-

water to the excavation and thus defeat dewatering.  At times, the wellpoint systems used at the Park either failed or did not properly dewater the site.  Under normal weather conditions, even a few failures of the dewatering system could have been mere "bumps in the road."  Under abysmal conditions, any failure, such as occurred at the Park, simply compounded seriously deteriorating site conditions.

B&G and TMS claimed Rust caused four major floods at the site due to failure to construct the berm, failure to seal off the mouth of the marina from the River (the plug was left intact by Rust according to the final design drawings but River levels exceeded the low point in the project), and two separate wellpoint system failures in December 2009 and January 2010 which flooded parts of the excavation.  With the acquiescence of TMS and B&G, Rust abandoned the original berm planned at the north end of the site to keep the stream 1 overflows at bay during rain events given that the berm created a barrier to the efficient traverse of construction equipment, time being of the essence once surface water slowed progress.  Further, TMS and B&G had Rust install a pipe and flap gate system at the mouth of the marina to stop further flooding from that direction.  TMS's testimony and documentary evidence regarding Rust's failures in this regard were not particularly convincing, especially in light of the multiple deteriorating conditions actually faced by Rust at the site.

Various witnesses for Rust, including Dr. Hyrciw testified that beginning on August 13, 2009 and thereafter, the site was subject to an artesian condition caused by an

-15-

unidentified highly permeable layer of subsurface material below the peninsula that extended under the west and southwest portions of the marina basin causing water to flow under pressure, constantly recharged, by the River into the marina. An artesian condition can create surface heaving and sand boils when groundwater bursts upward into the basin floor. Rust employees witnessed this and Dr. Hyrciw testified from photographs that the sand boils evident were the result of an artesian condition.

The artesian condition liquified soils in the basin, preventing efficient excavation and ultimately resulted in slope instability and failures. Running land-based equipment across the saturated soils further damaged the haul road, the excavation site and the equipment itself. Rust was forced to abandon its chosen method of tractor and pull pan in favor of excavators and articulated dump trucks, which was significantly slower and more expensive for Rust.

The City, particularly the Mayor, was becoming deeply dissatisfied with the progress yet everyone agreed that the weather was extraordinarily bad and the site was soaked, literally from the top and bottom, and increasingly difficult to manage. In September 2009, TMS requested that the City meet to discuss concerns regarding slope stability along the western marina slope. Rust would complete a section of slope only for it to begin sloughing and fail indicating a subsurface condition not evidenced by the slope stability analysis. By October 8, 2009, JJR issued a letter to TMS acknowledging the adverse weather conditions, restating its position that the slopes would be stable once the River floods in

and suggesting that TMS could dredge instead of excavating "in the dry" and warned TMS of the burdens upon it under Addendum 1.   JJR suggested that there was an expectation of all parties that much of the work would be performed underwater.  While the parties might have discussed any number of conditions prior to bidding, this letter does not acknowledge that the design drawings, the Project Manual and the Corps Permit restricted the project to excavation "in the dry."

Rust's bid anticipated normal weather conditions during the summer months, which provide for optimum drying time, with longer hours of sunlight, warmer temperatures, and less precipitation.  Rust's bid anticipated placing approximately 15,000 cy of engineered fill per working day which was driven by expected drying time for the soils and then placement.  This estimate was not unreasonable given sufficient time built into the project for completion, which might have involved additional shifts and weekend work.  However, all of the additional equipment and manpower any contractor could command could not increase productivity in the excavation and placement of soils unless they could be dried with equal speed.  As time wore on, the excessive rainfall, the artesian condition, falling winter temperatures and progressively shorter days, all combined, prevented Rust from drying the materials to place as fill.  Also the excessive rock slowed excavation and increased Rust's costs.

In October 2009, TMS directed Rust to begin stockpiling excavated material (that could not be dried and placed due to weather conditions), which significantly changed

-17-

Rust's subcontract.  Rust's bid anticipated handling materials once while stockpiling requires handling the materials at least twice and with different and more expensive equipment.

Rust did not provide TMS written notice of differing site conditions at this point. Rather, on October 13, 2009, TMS and Rust held a meeting regarding JJR's October 8, 2009 letter and the differing site conditions.  On October 15, 2009, Rust sent TMS a letter outlining the matters discussed and provided suggestions for framing a response to JJR and the City.  At this point, a new estimate for dewatering by Thompson Pump had been acquired and this time the estimate exceeded $200,000 depending upon the time necessary for its use.  Rust also notified TMS of excessive expenses due to the differing site conditions that were not accounted for in its bid, relating to dewatering, stockpiling saturated soils, excessive rock encountered and requested additional compensation for each of these.  At this point, Rust suggested that due to the excessive rainfall and the approaching winter months, without utilizing lime kiln dust as a soil amendment, there should be an open discussion of a winter shutdown of the project and an equitable adjustment of its subcontract time due to the adverse weather conditions.  Despite this detailed notice, TMS never issued Rust a formal change order extending its subcontract time.

On October 16, 2009, TMS responded to JJR's letter pointing out slope stability concerns and weather related issues and summarized by stating that 58 percent of the allowed time on the contract had been lost due to adverse weather conditions and also

stated that no one on the project had failed to perform.  This letter further notified JJR that conditions within the basin materially differed from those indicated in the contract documents and excessive amounts of rock were encountered and slope instability was a problem.  By this time, Rust had removed a total of 88,000 cy of rock (4 times its reasonable estimate) which slowed excavation and increased Rust's costs.

Rust was not privy to all communications between TMS, B&G, JJR and the City, despite all being available literally on site or in the neighborhood daily.  Instead of a response from JJR and the City about the differing site condition, on October 23, 2009 TMS issued to Rust a Notice of Cure giving Rust until October 30, 2009 to respond to its claims. The Notice of Cure, not mentioning that one week prior to the Notice, TMS had stated no one on the project had failed to perform, alleged that Rust had not met the time performance standards of the subcontract, not maintained adequate and experienced manpower on the project, not utilized idle equipment on site, did not appear to have an overall plan to complete the project, failed to fulfill various "agreements," and had an overall argumentative and negative attitude.

The claim that Rust had not met time performance standards of the subcontract was made despite the fact that B&G and the City had agreed that abnormal rainfall delayed work 7 days in July, 7.75 days in August and 15.25 days in September.  B&G admitted that in October, Rust was affected by rain 21 days and the project delayed by 17.5 days. Further, while the site earthwork was to be completed in 150 days, Rust could not begin

work until July 8 (due to the delay in the issuance of the Corps Permit), giving it

approximately four months to perform.

Rust responded on October 28, 2009 requesting, per the subcontracts, mediation

of the dispute.  Rust stated it had outlined the issues of the TMS Notice of Cure and not

received TMS's response to Rust's request for a change order.  Further, Rust stated JJR had

concluded that 54 percent of the time the site was unavailable for work due to extreme

weather conditions, Rust had maintained adequate manpower and the site would be

damaged by too much heavy equipment on cut and fill areas after rain events.  Rust ended

its letter stating it would continue work as planned on the project despite the pending

mediation.  Despite Rust's request for mediation, it never occurred and despite Rust's

request to cease excavation through the winter months (out of season for excavation in the

region) allowing the site to heal until spring or pay Rust to utilize lime kiln dust, TMS denied

those requests.

TMS notified Rust it was considering defaulting Rust for failure to meet performance

standards of the subcontracts, and demanded Mark Rust be on site in the future.  On

November 17, 2009, TMS presented Rust with a revised schedule which required Rust to

work in the off season, with completion of excavation on January 17, 2010 and finish

grading on February 20, 2010.  Substantial completion of the Phase 1 would be April 2,

2010.  Notwithstanding this, TMS did not issue Rust an extension of time under the

subcontracts.  Later, JJR recommended to the City that it extend TMS's time of performance

on Bid Package 1 until April 2, 2010 and that TMS be awarded Bid Package 2.  The City agreed as to TMS, but not to a time extension for Rust.

TMS forced Rust to continue work on the Project under threat of default on the subcontract "even if they bury their equipment up to the axles," which actually happened, causing extensive damage to Rust's equipment.  TMS demanded a meeting with Rust's performance bond surety.  TMS required an increase in Rust's workforce and acceleration of its work.  TMS began supplementing Rust's labor on the project and within 3 days notified Rust that B&G would take control of Rust's production to ensure compliance with the "Recovery Schedule" and would instruct Rust how to perform dewatering including where and when to install wellpoints.

From October 23, 2009 through its termination on February 19, 2010, Rust worked out of season and wastefully because TMS threatened Rust with default termination and a performance bond claim if it did not do so.  A successful claim on Rust's performance bond would result in its bankruptcy due to the inability to secure future bonds for construction projects.  By November 12, 2009, B&G was controlling Rust's work but with halting and intermittent success given the weather and site conditions.  In January 2010, Rust added a night crew, bringing its labor force on the project from 45 to approximately 60 workers.  This was possible because sub-freezing temperatures temporarily allowed Rust to excavate frozen materials.

Meanwhile the artesian condition worsened as the River elevation rose throughout the fall and into winter.  At the river's highest levels (370 feet in early February 2010), the large difference in water pressure (head) caused the seepage to be between 1 million to 10 million times greater than the conditions reasonably inferable by the contract documents and a flow impossible to stop according to Dr. Hyrciw.

By December 2009, TMS recognized that the artesian condition along the west and southwest marina slopes made it impossible to dewater the basin, even through use of a multi-layer wellpoint system.  On January 8, 2010, TMS formally notified the City of a differing site condition at the project, *i.e.*, an artesian condition, resulting from a gravel layer below the marina floor.  JJR rejected the differing site condition claim because it asserted bidders should have understood the effect of a differential head from the River.  This rejection never addressed the hydraulic conductivity of the soils.  Further, TMS did not tell Rust about JJR's rejection of the differing site condition claim for nearly a month.

When Rust finally received JJR's response, Rust immediately reiterated its intent to pursue a claim for differing site conditions.  TMS never pursued those claims further with the City.  During much of the earthwork excavation, the River was above normal pool and thus the excavation was outside of the Corps Permit scope.  TMS pushed construction without regard to River staging or its effect on excavation.  As part of Change Order 9 (and the award of Bid Package 2), TMS waived the claims in their entirety and, thus, assumed

responsibility to Rust for any differing site conditions and for construction when the River
was above normal pool.

In early February 2010, warm weather thawed the ground and increased rain made
the work site impassible and thus a night crew was especially unproductive.  Rust laid off
15 men who needed work or unemployment compensation.  Rust chose unemployment for
the workers who could not work on site.  Rust testified that the layoffs were due to project
conditions, not an intent to abandon the job.  At this same time, the River kept rising and
all work was suspended due to weather.  Believing that the rising River would overtop the
peninsula, earth plug and levy and flap gate system installed, Rust began moving its
equipment to high ground at the work site as its insurance did not cover flood damage at
the lower elevations.  Rust began to clean and repair the equipment on site.

Rust never abandoned the job, yet on February 11, 2010 it again advised TMS that
work could not be resumed until the weather and site conditions improved.  TMS had
already been paid by the City for work performed by Rust and reflected in Rust's December
invoice.  Rust requested payment from TMS.  TMS told Rust it had been paid enough.  TMS
began to back charge Rust for work where TMS claimed it had to supplement or correct
deficient work performed by Rust.  On February 12, 2010, TMS sent Rust a "Notice to Cure"
alleging that Rust had abandoned the project.

Rust immediately denied abandoning the project and asked TMS to commit to pay
Rust for work performed and already paid for by the City, to prosecute claims against the

-23-

City for additional time and money, and to allow Rust to work only when conditions were actually workable.  TMS did not respond.  Rust continued to work after the February 12, 2010 Notice by conducting site inspections, maintenance and equipment repairs.  In addition, Rust priced a new wellpoint system.

On February 19, 2010, TMS terminated Rust's subcontracts for abandonment, despite the fact that Rust had completed 99 percent of the Phase 1 subcontract and still had approximately 45 workers and more than 30 pieces of equipment ready to work when conditions permitted to finish the Phase 2 subcontract.  Rust did not remove its equipment from the project until after TMS terminated the subcontracts.   Internal TMS documents demonstrated that at this time, TMS knew the site needed to heal before further excavation and that there was no "commercially practicable answer other than time."

Upon termination of Rust's subcontracts, TMS made a claim against Rust's F&D performance bonds.  F&D paid TMS $2,975,441.12, the penal sum of Rust's performance bond on the Phase 2 subcontract.  At the time of termination, TMS retained over $590,000 of Rust's earned progress payments and had approximately $320,000 in the subcontract balance to complete Rust's scope of work.  Rust claims it was entitled to payment for additional costs incurred to accelerate its work and additional payment for costs it incurred by TMS's failure to meet its obligations under the subcontracts and its agreement with the City.

On February 22, 2010, facing financial ruin and the loss of its ability to obtain bonds on future projects, Rust filed its Voluntary Petition seeking relief under Chapter 11 of the United States Bankruptcy Code.

On May 1, 2010, a one thousand year flood of the Cumberland River occurred and completely engulfed the work site.  The river level reached 393.48 feet and completely submerged the site under twenty feet of water.

### CONCLUSIONS OF LAW

On August 8, 2010, Rust initiated this adversary proceeding with the filing of its three Count Complaint against TMS and F&D.  Count I sets forth a claim against TMS based on breach of the subcontracts between TMS and Rust.  Count II is a claim against TMS for wrongful termination of Rust on the subcontracts.  Count III is against  F&D for its failure to pay Rust under the Payment Bond issued to TMS for work performed under the subcontracts but not paid by TMS.  In response to the Complaint, TMS filed a Counterclaim against Rust.  The Counterclaim sets forth a claim for breach of the subcontracts.  The Findings of Fact establish that Rust is entitled to recover on its Complaint against TMS and F&D for breach of the subcontracts and the Payment Bond.  There is no merit to TMS's Counterclaim and it is dismissed with prejudice.

**A.  Count I: Breach of the Subcontract by TMS**.

TMS and Rust entered into two subcontracts – one for excavation of the Pond and one for excavation of the Marina.  The Findings of Fact demonstrate that Rust encountered

numerous changed site conditions that Rust could neither have anticipated nor controlled that prevented it from performing the subcontracts in a timely manner. The Court is convinced that the excessive, abnormal weather conditions caused increased storm water runoff on the project. Additionally, the bid documents provided by TMS did not accurately reflect the true soil conditions at the site. The Contract required TMS to control the storm water runoff, a condition it failed to control. As a result, Rust could not adequately perform its excavation work resulting in work stoppages and delays in its completion of the project. Rust incurred increased costs and expenses to dewater and excavate the site, well above anyone's expectations and the subcontracts' requirements. TMS's failure to carry out its contractual obligations, including compensating Rust, ultimately resulted in the financial demise of Rust.

A breach is "material" if a party fails to perform a substantial part of a contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence to the contract. *Memphis-Shelby County Airport Authority v. Illinois Valley Paving Co.*, 2006 WL 2715335 (Sept. 22, 2006 W.D. Tenn.), quoting, *23 Williston On Contracts*, §63.3 (4th Ed.). TMS's failure to control the water run-off, provide accurate information regarding soil conditions and dewatering of the site constitute material breaches of the subcontract. Rust is entitled to

recover its increased  costs incurred in re-working the slopes, controlling runoff and attempting to dewater the site.

### 1.  **Breach Due to Differing Site Conditions**.

The City of Clarksville's Contract with TMS contains a "differing site condition clause" within the Contract.  This clause was incorporated by reference into the subcontract between Rust and TMS.  The clause provides that if "any subsurface or physical condition is uncovered or revealed [which] . . . differs materially from that shown or indicated in the contract documents,"

> The Contract Price or the Contract Times, or both will be equitably adjusted to the extent that the existence of such differing subsurface or physical condition causes an increase or decrease in the Contractor's cost of, or time required for, performance of the work.

*See*, Contract, General Conditions §§4.03(c)).

In order to prevail on a claim based on differing site conditions, the plaintiff must prove the following elements: (1) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the claim; (2) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (3) the contractor must have reasonably relied on the indications of subsurface conditions in the contract; (4) the subsurface conditions actually encountered must have differed materially from the subsurface conditions indicated in the contract area; (5) the actual subsurface conditions encountered must have been reasonably unforeseeable; and

-27-

(6) the contractor's claimed excess costs must be solely attributable to the materially different subsurface conditions. *See*, *Weeks Dredging & Contracting, Inc. v. U.S.*, 13 Cl. Ct. 193, 218 (Cl. Ct. 1987) and cases cited therein. The following analysis of each of the elements establishes that Rust met its burden of proof on this claim.

The first element is whether the contract documents affirmatively indicated or represented the subsurface conditions. *Weeks*, 13 Cl. Ct. at 218. The contract indications need not be specific or explicit so long as there is enough of an indication on the face of the contract documents for a bidder to reasonably not expect the subsurface or latent conditions that existed at the site are materially different from those indicated in the contract. Rust proved that the site soil hydraulic conductivity and moisture content actually encountered was materially different from the information provided in the bid package. The overwhelming weight of trial testimony supports this conclusion.

The second element requires proof that the contractor acted as a reasonably prudent contractor in interpreting the contract documents. *Id.* The issue here is whether Rust acted as a reasonably prudent earthmoving contractor or bidder in interpreting the documents and formulating its bid. Rust was not expected to anticipate a worst-case scenario, only for evaluating the available information and reasonably extracting from such information subsurface conditions. *Fru-Con Const. Corp. v. U.S.*, 44 Fed. Cl. 298, 309 (Fed. Cl. 1999). The Court concludes Rust's actions pre-bid and interpreting the information available were those of a reasonable earthwork contractor.

-28-

Third, Rust had to have reasonably relied on contract indications on subsurface conditions.  *Weeks*, 13 Cl. Ct. at 218.  The documentary evidence and testimony presented at trial supports a finding that Rust's action in submitting its bid and its work efforts were based on the representations in the contract documents regarding subsurface conditions.

Fourth, and the most important element, is that the actual subsurface conditions actually encountered differed materially from those indicated in the contract documents.  *Id*.  There must be a "comparison of the subsurface conditions, both estimated and actual" contained in the area as defined in the contract documents.  *Weeks*, 13 Cl. Ct. at 228.  The Findings of Fact set forth in detail the vast difference in the soil conditions represented in the contract documents and what actually existed.

Fifth, the actual subsurface conditions that differed materially from those represented in the contract documents must have been reasonably unforeseeable based on all information available to the contractor at the time the bid was prepared and submitted.  *Weeks*, 13 Cl. Ct. at 218.  The Court has already determined that Rust's pre-bid site investigation and its bid were reasonable based on the information available.  At trial, TMS repeatedly pointed to Addendum 1 of its Contract with the City as the basis of its claim that Rust should have reasonably expected wet materials and the possible need to dredge.  However, based on the design drawings and the Corps Permit, TMS's reliance was without merit.  There was nothing in Bid Package 1 that would have led Rust to predict the soil conditions as they actually existed.  It is disingenuous for TMS to argue that Rust should

have anticipated water innundation from above and below where it had failed to include a vertical groundwater cutoff system in the final design drawings. The reference to "wet materials" was not notice of an artesian condition. Rust carried its burden of proof on this element at trial.

Finally, Rust had to prove that its claimed excess costs were solely attributable to the materially different subsurface condition. *Id.* There was no credible proof presented to the Court to support a claim that any excess costs encountered by Rust were due to its own mistakes. The expert testimony of Dr. Hyrciw and the testimony of Mark Rust established that Rust's increased costs, above what it bid, were directly attributable to the different subsurface conditions encountered.

The Contract also contained obligations on the part of the contractor to perform a site investigation. This duty required the contractor to familiarize itself with the site conditions on the project before bidding. Any contractor must perform a reasonable investigation, but is not required to discover all hidden conditions or hidden subsurface conditions that would not be revealed by reasonable pre-award inspection. *See, Smith, Currie & Hancock, Common Sense Construction Law*, pp. 266-67, citing *Farnsworth Chambers Co. v. United States*, 346 F.2d 577 (Ct. Cl. 1965); *Vann v. United States*, 420 F.2d 968, 983 (Ct. Cl. 1970); *Travelers Cas. & Sur. Co. v. United States*, 75 Fed. Cl. 696, 714 (2007). *See also*, authorities set forth in pp. 4-7 of Rust's Pretrial Statement of Applicable and Governing Law.

Important to the Court's analysis on the determination as to whether a site investigation is reasonable are several factors. These include (1) time allowed by the owner for investigation; (2) the extent of site access; (3) conditions observable at the time of year; (4) the cost of independent site exploration; and (5) the specificity and sufficiency of information furnished by the owner. *4A Bruner & O'Conner* §14:55, p. 810.

The trial testimony established that Rust did a reasonable pre-bid investigation on the site prior to submitting its bid. Rust examined the site with TMS and its project consultant, B&G. It dug test pits and studied the subsurface conditions. Mark Rust took soil samples back to his office for further review. Finally, the soil samples were compared to the soil borings and engineering data provided by TMS in the bid packages.

The trial testimony also established that Rust's actions with respect to its site investigation were typical of those of a reasonable earthwork excavator. Rust's expert, Dr. Hyrciw, testified that typical earthwork contractors would not independently obtain or perform their own engineering reports, but rather were entitled to rely on the reports provided by the contractor, here, TMS. This testimony was corroborated by Rust and not sufficiently rebutted by TMS.

The engineering reports and test borings did not reveal the true high moisture content and high hydraulic conductivity of the soil which required greater dewatering efforts and costs on the site than any potential bidder could have anticipated. The Court finds that TMS's failure to update the slope stability analysis and include a vertical

-31-

groundwater cutoff system in the final design drawings mislead Rust as to the true nature of the site conditions and the "means and methods" necessary to excavate the marina basin "in the dry." Even TMS's own geotechnical expert, Timothy LaGrow, agreed that only a geotechnical engineer with a master's degree and specialized experience could reasonably understand the artesian condition potentially present based upon the contract documents provided. There was no breach by Rust of its duty to conduct a reasonable site investigation.

The Court's findings regarding the differing site conditions is also bolstered by other contractors' bids with respect to dewatering management on the project. Bids submitted by Griffin Dewatering and Civil Constructors were similar to the amount bid by Rust for the same work. The subsurface conditions actually encountered were materially different than those anticipated in the contract documents and considerably more expensive to manage. This would have been true, even without the abnormal rains encountered during the time of performance of the subcontracts. The abnormal amount of rain only exacerbated the condition. The costs over and above the subcontract bid by Rust on dewatering of the project (totaling over one million dollars) is also indicative of the different site conditions. See, *S.J. Groves and Sons & Co. v. State*, 273 S.E.2d 465, 496 (N.C. App. 1980) [where similarity between the owner's estimate and a contractor's bid was a "significant" indication that neither anticipated the unstable and unworkable soil conditions which resulted in the ensuing costs overruns.]

-32-

The Contract provided that the costs and time of performance under the Contract would be equitably adjusted to the extent of the existence of different site conditions. Despite overwhelming proof that differing site conditions existed and a request from Rust for additional compensation based on these conditions, TMS denied Rust's claim. TMS breached this provision of the Contract. Rust is entitled, under the plain, unambiguous terms of the Contract, to recover its increased costs incurred due to the different site conditions encountered.

**2. Rock as Different Site Conditions.**

Rust took standard earthwork contractor measurements of the rock it estimated was present on-site. Rust then used these measurements and a software program accepted in the industry to estimate 22,000 cy of rock. Rust ended up excavating 88,000 cy of rock from the site. B&G criticized Rust's methods of excavating the rock. Rust, however, disagreed with B&G's suggestion regarding blasting of the rock based on its belief that blasting without sufficient overburden would create an unsafe condition and violate the Project's safety plan.

The amount of rock actually excavated by Rust compared to initial estimates, resulted in time delays and cost increases on the Project. Further, the topographical features of the rock on-site, *i.e.*, pinnacles, increased Rust's costs and time of performance, even while weather conditions were workable, beyond its reasonable expectations.

-33-

The site, however, under the terms of the subcontract was an "unclassified" site. As such, no separate payment was allowed for rock excavation. Accordingly, the risk for estimating the amount of rock on-site, as well as all additional costs beyond its bid incurred by Rust in excavating the rock were contractually the responsibility of Rust. While the excessive amount and type of rock resulted in delays and additional costs, it did not result in a differing site condition and Rust is not entitled to recover any increased costs associated with its rock excavation.

### 3. Breach by TMS for Failing To Award Rust Additional Time.

In addition to failing to adjust the Contract's price due to differing site conditions, the trial testimony and documentary evidence established that TMS breached the Contract by failing to give Rust additional time to perform under the subcontract. TMS acknowledged that the unusual and excessive weather conditions resulted in delays on the Project. The correspondence between TMS and Rust in September and October 2009 proves that the parties were constantly discussing weather related issues and delays on the Project. TMS acknowledged the problems caused by weather and requested that the City issue an extension of time due to the abysmal weather conditions. *See* Rust, Ex. 12. In fact, TMS acknowledged in its written request for an extension to the City that there had been no failures to perform by any party, but that the weather was adversely affecting the ability to timely complete the work schedule.

Rust's request for additional time could not have been unexpected by TMS, considering the extensive communications between Rust's representatives and TMS's own personnel and JJR. While TMS lobbied for the extension on Rust's behalf due to weather conditions, the City denied the request. However, after Rust was terminated from the project by TMS, TMS actually received a time extension based on abnormal weather conditions from the City. This condition existed at the time Rust was still on the project. TMS's failure to pursue additional time for Rust, but to instead require Rust to press forward under the original time constraints, constitutes a breach of the contract.

**B.  Count II: Wrongful Termination**.

In Count II of its Complaint, Rust asserted a claim against TMS based on TMS's wrongful termination of the subcontract. The case presented by Rust at trial established that Rust met its burden of proof that TMS wrongfully terminated the subcontract and was responsible for the resulting damages to Rust.

Rust had attempted to excavate the Marina despite unusually severe weather conditions at the site throughout the fall of 2009 and into early 2010. In January 2010, Rust had increased its workforce and was running extra shifts. The weather, however, deteriorated further in early February and Rust could no longer work the site due to impassable road and site conditions. The Cumberland River began to rise and work had to be suspended. Thus, Rust laid off 15 workers so they could be eligible for unemployment compensation benefits. Rust believed the rising river would flood the

-35-

Marina area and destroy its equipment.  The equipment was therefore moved to higher ground.

Rust had not been paid by TMS for its December work and TMS, through Thom Spignor, made clear that it would not pay Rust for this work, while acknowledging that it had received payment for this time from the City .  Instead, TMS issued a Notice to Cure to Rust on February 12, 2010 asserting Rust had abandoned the project.  Despite Rust's requests to TMS to pay it for work performed, pursue the City for additional time and payment under the Contract and allow Rust to return to work once the conditions became acceptable, TMS refused.  On February 19, 2010, TMS terminated Rust's subcontract alleging abandonment.

The overwhelming weight of the evidence proved that TMS's termination of the subcontract was without sufficient legal cause.  TMS had not given Rust a copy of the Corps Permit for the site which prohibited construction activities at the site when the river was higher than "normal pool."  TMS, in violation of the permit, pushed Rust to continue working at the site without regard to the rising river and its effect on the area.

A contracting party may terminate the contract when the other party (1) is wholly unable to complete the contract, *City of Bristol v. Bostwick*, 146 Tenn. 205, 211, 240 S.W. 774, 776 (1922), (2) manifests an intent to abandon the contract, *Brady v. Oliver*, 125 Tenn. 595, 614, 147 S.W. 1135, 1139 (1911), (3) manifests an intent to no longer be bound by the contract, *Church of Christ Home for Aged v. Nashville Trust Co.*, 184 Tenn. 629, 642, 202

-36-

S.W.2d 178, 183 (1947), or (4) commits fraud on the party seeking to terminate the contract.
*W.F. Holt Co. v. A&E Elec. Co.*, 665 S.W.2d 722, 730 (Tenn. Ct. App. 1983); *McClain v. Kimbrough Const. Co. Inc.*, 806 S.W.2d 194 (Tenn. App. 1990).

There is no evidence that Rust committed fraud or that it could not complete the subcontract in accordance with the subcontract specifications and terms, but for the time originally allotted.  There was no justification for TMS to terminate the subcontract, other than the intense pressure it was receiving from the City to remove Rust from the project.

In *McClain*, the Court stated that, "In the construction context, we have imposed upon contractors the obligation to give their subcontractors a reasonable opportunity to perform." *Id.* at 198, citing *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 425-26 (Tenn. Ct. App. 1978).  Given the weather conditions, rising river and different site conditions - all factors beyond the control of Rust - there is no credible evidence that Rust had a reasonable opportunity to fully perform the subcontract.   TMS issued a Notice to Cure to Rust, but there was no reasonable opportunity to correct or fulfill its contract obligations.  TMS knew full well that the site "needed to heal" before meaningful work could continue.  Despite this information, TMS wrongfully terminated the subcontract.

Post trial, Rust brought to the Court's attention a recent decision from the United States Court of Federal Claims, *Martin Construction, Inc. v. United States*, 2011 WL 6367690 (Fed. Cl. Dec. 20, 2011).  After reviewing the Opinion and considering the comments of counsel for the parties on the issue, the Court determines that the *Martin Construction*

decision, while only persuasive authority on this Court, is instructive.  Primarily, the factual

background of *Martin Construction* is similar to the facts in this case.  Most important to this

Court is the *Martin Construction* court's conclusion that a contractor may not reserve its

claim of a default of a contract while simultaneously allowing expiration of the time of

performance under the contract while compelling more work by the subcontractor.  Here,

TMS modified Rust's scope of work to require stockpiling, even though the subcontract

required placement of structural fill.  Further, TMS threatened Rust on its bond, while

requiring Rust to continue working through the winter months.  TMS waived its right to

declare a default or terminate the subcontract by pressing Rust to work beyond the

required time of performance in the subcontract and into the winter season under

increasingly impossible conditions.

Similarly, as in *Martin Construction*, there is no justification for TMS, like the

government in *Martin Construction,* to declare a default after the original conclusion date

set forth in the subcontract.  Despite requiring additional work beyond the scope of work

in the subcontract, TMS did not change the completion date of the subcontract or issue a

formal time extension or change order to Rust.  It was incumbent upon TMS to prove there

was no reasonable likelihood that Rust could complete the contract within the specified

time prior to declaring a default.  *See*, *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759,

765 (C.A. Fed. 1987).  TMS failed to meet this burden and wrongfully terminated its

subcontract with Rust.

The proper measure of damages where a contractor improperly terminates a contract after a subcontractor has partially performed is the net profits the subcontractor would have made had it been permitted to complete the contract. *McClain*, 806 S.W.2d at 200. The subcontractor is also entitled to recover the value of the work actually performed, reasonable profit on such costs, plus anticipated profit for any work not yet done. *Id.* Rust is entitled to recover these items due to wrongful termination of the subcontract by TMS.

## C. **Count III: Breach of Payment Bond by F&D**.

On February 27, 2009, F&D as surety issued a payment bond in the amount of $7,987,350 to TMS as Contractor on the City of Clarksville Fairgrounds Park Reconstruction Bid Package I. Paragraph 1 of the Payment Bond states:

> Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to Owner to pay for labor, materials, and equipment furnished by Claimants for use in the performance of the Contract, which is incorporated herein by reference.

A Claimant is defined under the Payment Bond as follows:

> Claimant: An individual or entity having a direct contract with Contractor, or with a first-tier subcontractor of Contractor, to furnish labor, materials , or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service, or rental equipment used in the Contract, architectural and engineering services required for performance of the Work of Contractor and Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials, or equipment were furnished.

It is beyond dispute that Rust was a "Claimant" as defined in the Bond. As a Claimant under the Payment Bond, Rust's duties to obtain payment under the Bond were set forth in paragraph 4 as follows:

> Surety shall have no obligation to Claimants under this Bond until:
>
> Claimants who are employed by or have a direct contract with Contractor have given notice to Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

Rust submitted a claim to F&D in compliance with the terms of the Payment Bond in the amount of $4,453,087. These sums were due and payable under the subcontract and TMS failed to pay Rust. Under the Payment Bond, this claim became the contractual obligation of F&D. A subcontractor has a remedy against a surety for recovery of the value of labor and materials supplied by him in pursuing work covered by the bond. The language of the bond must be evaluated to determine if the bond provides any limit on the recovery. *Lexicon, Inc. v. Safeco Ins. Co. of America, Inc.*, 436 F.3d 662 (6th Cir. 2006). Here, the bond covered "labor, materials and equipment used in performance of the Contract." F&D wrongfully denied Rust's claim to these funds under the Payment Bond and Rust is entitled to recover under the Bond the full amount of payments for work performed but not paid by TMS.

**D. Damages**.

In its bid for the project, Rust estimated it would incur $3,092,984 in direct costs.  As a result of the differing site conditions encountered, including extra dewatering efforts as well as being forced to work at times when the permit and weather did not allow, Rust's actual direct costs by February 19, 2010 were $6,408,533.  At that time, Rust had completed approximately 92% of the work on Phases 1 and 2 and had incurred costs of $2,845,544. This resulted in $3,526,989 in cost overrun charges on the Project through February 19, 2010.  *See*, Exhibits 339 and 477, Report and Amended Report of Mark I. Anderson.

According to Rust expert, Mark I. Anderson, a consultant with Warner Construction Consultants, Inc., Rust incurred the $3,562,989 in direct costs above its estimate. Additionally, Rust incurred $3,397,497 as a result of differing site conditions and TMS changes to the subcontract, including $1,375,312 for inefficient excavation costs, $1,513,928 for water /dewatering management, $241,286 for added rock excavation (the Court will not allow recovery for this item since it determined this was not a differing site condition under the subcontract), $135,511 for inefficient grading costs, and $131,460 in extended site support costs.  Ex. 477, 4-A-2.  Anderson's calculation for overhead ($577,574) and profit ($509,624) raised the loss to $4,484,695.  Finally, TMS failed to pay Rust on invoices and retainage totaling $594,941.  The total amount due Rust from TMS under the subcontract is $4,838,351.

The Court has found no justification for F&D's failure to pay Rust on its claim on the Payment Bond.  The claim was properly submitted and should have been paid.

Accordingly, the total recovery owed to Rust from TMS and F&D is $4,838,351. A Judgment incorporating the findings herein is attached to this Memorandum-Opinion.

## **CONCLUSION**

For all of the above reasons, the Court will enter a Judgment in favor of Debtor/ Plaintiff Rust of Kentucky, Inc. on its Complaint and against TMS Contracting, LLC and Fidelity and Deposit Company of Maryland in the amount of $4,838,351.

## UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

IN RE:

RUST OF KENTUCKY, INC.                                CASE NO.: 10-10271(1)(7)

_____Debtor_____

RUST OF KENTUCKY, INC.                                AP NO.: 10-1032

Debtor-in-
Possession/Plaintiff

vs.

TMS CONTRACTING, LLC, et al.

_____Defendants_____

### <u>JUDGMENT</u>

Pursuant to the Memorandum-Opinion entered this date and incorporated herein

by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in

favor of Debtor/Plaintiff Rust of Kentucky, Inc. on its Complaint against Defendants TMS

Contracting, LLC and Fidelity and Deposit Company of Maryland in the amount of

$4,838,351, including prejudgment interest, costs and expenses.

This is a final and appealable Judgment.  There is no just reason for delay.